# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

POOJA MUNDRATI,      )
            )
      Plaintiff,   )
            )
  vs           )   Civil Action No. 23-1860
            )
UNUM LIFE INSURANCE COMPANY OF  )   Magistrate Judge Patricia L. Dodge
AMERICA d/b/a UNUM,     )
            )
      Defendant.  )

## MEMORANDUM OPINION

Plaintiff Pooja Mundrati (Plaintiff or "Dr. Mundrati") brings this action against Defendant Unum Life Insurance Company of America d/b/a Unum ("Unum"), asserting a claim under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1100-1145 ("ERISA"). Her claim arises from Unum's decision to deny her claim for long-term disability ("LTD") benefits.

Presently before this Court for disposition are cross-motions for summary judgment. For the reasons that follow, the motion filed by Plaintiff will be granted and the motion filed by Defendant will be denied.

### I. Relevant Procedural History

Plaintiff commenced this action on October 27, 2023, invoking federal question jurisdiction based on the ERISA claim. 28 U.S.C. § 1331, 29 U.S.C. § 1132(a)(1)(B), (e). Following the submission of the administrative record, cross-motions for summary judgment were filed on June 17, 2024 (ECF Nos. 23, 26), and have been fully briefed (ECF Nos. 24, 30, 39, 42, 44, 46). Oral argument was held on January 22, 2025.

## II.    Factual Background

### A.    Relevant Policy Terms

Unum issued a group LTD plan and administered benefits under Group Policy No. 421054001 to Summit Orthopedics, Ltd. ("Summit"), Dr. Mundati's former employer ("Policy" or the "Plan"). As stated in the Additional Summary Plan Description Information, benefits determinations under the Policy are "controlled exclusively by the policy, your certificate of coverage and the information contained in this document." It also provides, "The Plan is administered by the Plan Administrator. Benefits are administered by the insurer [Unum] and provided in accordance with the insurance policy issued to the Plan." Unum is also identified as the "claims fiduciary for the Plan." (Defendant's Statement of Undisputed Facts ("DSUF") ¶¶ 1-4) (ECF No. 26).

As pertinent to Dr. Mundrati's claim, the Policy defines disability as follows:

**All Physicians and C-Level Employees**
You are disabled when Unum determines that:
- you are **limited** from performing **the material and substantial duties** of your **regular occupation** due to your **sickness or injury**; and

- you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

An insured "must be continuously disabled through your elimination period. […] Your elimination period is 90 days." (*Id.* ¶¶ 5-6.)

The Policy defines "limited" as "what you cannot or [are] unable to do" and "material and substantial duties" as those that "are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified." (Plaintiff's Concise Statement of Material Facts ("PCSMF") ¶ 2) (ECF No. 29.)[1]

---

[1] Unum's response to this statement, in which Dr. Mundrati was quoting from the Policy (and

The Policy defines "regular occupation" as "the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." (DSUF ¶ 8.) It adds that, for physicians, regular occupation means "your specialty in the practice of medicine which you are routinely performing when your disability begins." (PCSMF ¶ 2; Plaintiff's Response to Defendant's Concise Statement of Facts ("PRDCSF") ¶ 8) (ECF No. 43.)

The timing of payments is addressed in the Policy as follows:

**WHEN WILL PAYMENTS STOP?**

We will stop sending you payments and your claim will end on the earliest of the following:

**All Physicians and C-Level Employees**
- when you are able to work in your regular occupation on a part-time basis and you do not; […].

(DSUF ¶ 7.)[2]

The Policy also outlines the particular information to be evaluated by Unum as proof of a claim:

---

virtually all other statements of material fact) is "denied as stated" followed by the comment, "The Policy is in writing, speaks for itself, and is the best evidence of its contents. Unum denies any characterization inconsistent therewith." (ECF No. 41 ¶ 2.) Unum then incorporates by reference its entire motion for summary judgment and response to Plaintiff's motion. Responses of this nature undermine the very purpose of having concise statements of material fact, namely, to direct the Court to precise points in the record where the parties genuinely disagree about material facts.

[2] Unum construes this provision together with the previously cited ones to conclude that if a claimant can return to part-time work during the elimination period, then she is not "disabled" under the Policy. Plaintiff responds that this provision concerns the termination of previously approved benefits and that she cannot be described as someone who was able to work part-time but refused to do so. This issue is discussed below.

**WHAT INFORMATION IS NEEDED AS PROOF OF YOUR CLAIM?**
**All Physicians and C-Level Employees**

Proof of your claim, provided at your expense, must show:
- the date your disability began;
- the existence and cause of your sickness or injury;
- that your sickness or injury causes you to have limitations on your functioning and restrictions on your activities preventing you from performing the material and substantial duties of your regular occupation;
- that you are under the regular care of a physician;
- the name and address of any hospital or institution where you received treatment, including all attending physicians;
and
- the appropriate documentation of your monthly earnings, any disability earnings, and any deductible sources of income.

(*Id.* ¶ 10.)

      B.  <u>Dr. Mundati's Job Duties</u>

According to Unum, Dr. Mundrati was a Physical Medicine and Rehabilitation Physician with the following material and substantial duties:

Evaluates patients through interviews and by performing examinations using medical instruments and equipment. Administers or orders various tests, analyses, and diagnostic images to provide information on patient's condition. Analyzes reports and findings of tests and of examination, and diagnoses condition. Administers or prescribes treatment and drugs. Conducts fitness physical examinations.

(*Id.* ¶ 11.) It asserts that this description is consistent with the job duties described by Dr. Mundrati and Summit.

Dr. Mundrati disagrees that Unum's description accurately captures her job duties. (PRDCSF ¶ 11.) She describes herself as a "Physical Medicine and Rehabilitation Physician with interventional spine and sports fellowship training" who was employed by Summit in their spine specialty group as an "Interventional Spine Physician" ("ISP") (UA-CL-LTD-001109 ¶ 2.) *See* PCSMF ¶ 5.

Based on the normal performance of a physician in the national economy, Unum found the demands of Dr. Mundrati's position to be the following:

> Physical Demands:
> Light Work: Lifting, carrying, pushing, and pulling 20 lbs. occasionally, frequently up to 10 lbs. or negligible amount constantly.
> Frequent: sitting, reaching.
> Occasional: standing, walking, stooping.
>
> Mental/Cognitive Requirements:
> Dealing with People: Involves interpersonal relationships in job situations beyond receiving work instructions.
> Performing Effectively under Stress: Involves coping with circumstances dangerous to the worker or others.
> Directing, Controlling, or Planning Activities for Others: Involves accepting responsibility for formulating plans, designs, practices, policies, methods, regulations, and procedures for operations or projects; negotiating with individuals or groups for agreements or contracts; and supervising subordinate workers to implement plans and control activities.
> Making Judgments and Decisions: involves solving problems, making evaluations, or reaching conclusions based on subjective or objective criteria, such as the five senses, knowledge, past experience, or quantifiable or factual data.

(DSUF ¶ 12.)

Dr. Mundrati states that she is an ISP, which, according to the American Association of Physical Medicine and Rehabilitation, is considered the same as a physiatrist.[3] According to the Dictionary of Occupational Titles ("DOT"), a physiatrist is considered a medium-duty occupation.[4] (ECF No. 24 at 14-15; ECF No. 39 at 5-6 & Ex. 1.)

C.  Dr. Mundrati's Injury and Subsequent Medical Issues

Dr. Mundrati was involved in a motor vehicle accident on February 27, 2018. (PCSMF ¶ 3.) She later went to the emergency room with complaints of pain, nausea and dizziness. She had no loss of consciousness, no amnesia for the event, and no signs of blunt head trauma.

---

[3] https://www.aapmr.org/about-physiatry
[4] https://occupationalinfo.org/07/070101070.html

(DSUF ¶¶ 15-16.) Soon after, she was diagnosed with a traumatic brain injury ("TBI") by Dr. Rebecca McNamara, who advised her to taper down her work. (PCSMF ¶ 3.)

On May 10, 2018, Dr. Mundrati underwent a neuropsychological evaluation. That testing concluded that there was no clear evidence of impaired executive functioning or a primary linguistic disorder. She demonstrated significant strengths in terms of attention and concentration, working memory, verbal and visual memory, and visuospatial perception. Accordingly, it was concluded that "[t]he nature of the patient's motor vehicle accident and her current neurocognitive profile suggest a low likelihood that she will be left with permanent acquired brain dysfunction." (DSUF ¶¶ 17-20.)

Several weeks later, Dr. Mundrati underwent a brain MRI that was normal. By January 11, 2019, it was noted that she was doing well cognitively, had not engaged in errors or near misses, and had resumed her full range of clinical duties after a period of observation by colleagues. (*Id.* ¶¶ 21-22.)

A neuro-ophthalmology exam on May 31, 2019 found that Dr. Mundrati's vision was 20/20 without relative afferent pupillary defect. She presented with post-concussive syndrome with no evidence of ophthalmic injury, and she had no signs of convergence insufficiency. A follow-up examination on December 3, 2019 reported clear vision in both eyes, no pain in either eye, no double vision and no objective evidence of ophthalmic injury. (*Id.* ¶¶ 23-25.)

D.  Dr. Mundrati's Return to Work

Dr. Mundrati had returned to work in July 2018 following an evaluation and plan developed by Philip Hagen, M.D. and Melanie Swift, M.D. of the Mayo Clinic. As Dr. Hagen noted, Dr. Mundrati had shadowed physicians in her clinical practice over the course of a few weeks and had reacclimated back to the clinical setting. Accordingly, he proposed that she return

6

for two half days per week in a normal outpatient clinical schedule and with a reduced patient load (60-70%) in her procedural injection practice. It was expected that she could return to full function over the course of 6-12 weeks. (DSUF ¶¶ 26-29.) *See* PCSMF ¶¶ 5-6. In September 2018, the restrictions and limitations ("R&Ls") imposed by her physicians allowed Dr. Mundrati to add ½ day every two weeks, to continue with 66% patient load and to return to procedures with colleague oversight. (PCSMF ¶ 7.)

Dr. Mundrati was scheduled to return by January 14, 2019 to working 9:00 a.m. to 4:00 p.m. Monday through Friday with 100% clinical patient load. She had already resumed interventional procedures without incident. Because overnight call would consist of seven consecutive nights and require fielding urgent daytime calls on the weekend, it was recommended that she take call for the first time in April 2019 and that her daytime clinical schedule be reduced to 50% during that on-call week. (DSUF ¶¶ 30-31; PCSMF ¶ 8.)

E.    Dr. Mundrati Reports "Major Setback" and Additional Medical Treatment

Despite working this schedule over the next several months, Dr. Mundrati described "a major setback" in January 2019 that she attributed to her increased workload. On July 23, 2019, Dr. Swift recommended a modification of her work status and duties with these restrictions: "No more than 24 hours of direct patient care per week and no more than 3 hours per day of direct patient care during call weeks. Additionally, requires a full day off of all clinical duties following each call week." Dr. Mundrati followed this schedule through January 2021, at which time Dr. Hagen recommended that these work restrictions be "permanent (for the foreseeable future)." (DSUF ¶¶ 32-34; PCSMF ¶ 9.)

Because of worsening TBI symptoms, Dr. Mundrati began seeing Dr. Min Graf, a TBI specialist, in October 2019. When initially seen, her symptoms included: chronic daily migraine

headaches ranging from moderate to severe (for which Dr. Graf recommended botox injections because of the failure of other medications); significant vision problems of photophobia, convergence and divergence insufficiencies and fatigue from looking at a computer screen (which led Dr. Graf to refer her to Dr. Amy Chang in Developmental Optometry); and cognitive fatigue and "notable physical fatigue" (as a result of which Dr. Graf referred her to Speech Therapy and Endocrinology Labs, respectively). (PCSMF ¶ 10.)

Dr. Mundrati also was seeing Dr. Ana Groeschel, a board-certified neurologist at Noran Neurological Clinic, based on complaints of migraines, difficulty concentrating, and neck and low back pain. She reported constant migraine headaches ranging from moderate to severe, with the severity increasing as she exerted herself. There was an increase in both frequency and severity after January 2019 and her score on a migraine disability assessment in January 2020 was "severe." A Cefaly device was prescribed for her in January 2020 as a different treatment modality. (*Id.* ¶ 11.)

Dr. Mundrati was also experiencing visual impairments, including photophobia, decreased endurance, pain and pressure behind her eyes and convergence and accommodative insufficiencies. Some of these symptoms improved, but she also had regular setbacks. For example, with respect to her convergence insufficiency, she presented with a new diagnosis of accommodative insufficiency during a May 29, 2020 exam with Dr. Chang. The most disabling symptoms, like the pain and pressure behind her eyes, resultant headaches from increased visual strain and fatigue, never abated. Her accommodative insufficiency improved but never reached normal amplitudes. (*Id.* ¶ 12.)

In November 2019, during Dr. Mundrati's initial assessment with Speech-Language Pathologist Molly Nicolai, she demonstrated cognitive-linguistic deficits including decreased

mental endurance, and had more fatigue with high cognitive demands. Nicolai noted that Dr. Mundrati "would likely test well on formal cognitive assessment because her concerns and symptoms are related to symptom and energy management along with difficulty tolerat[ing] extended cognitive/mental exertion." Her R&Ls remained in effect due to concerns about repeating the rapid downturn in January 2019. (*Id.* ¶¶ 13-14.)

Starting in July 2020, Dr. Mundrati became fatigued from driving longer than 30 minutes to Summit's more distant work sites and looking at a computer screen for extended periods. The following restrictions were added: no driving longer than 30 minutes; mixing face-to-face clinical work with telemedicine visits; and avoiding multiple consecutive telemedicine visits. (*Id.* ¶ 15.)

Dr. Graf noted in November 2020 that her migraines were still occurring daily on a 7/10 pain scale despite numerous medications. While her convergence insufficiency and accommodative insufficiency had improved, she had seen no subjective or functional gains, and her metrics had worsened upon examination by Dr. Chang in May 2020. In December 2020, she saw Dr. Hagen one last time, who noted that her symptoms persisted, her improvement had plateaued and she had reached maximum medical improvement. He therefore made the R&Ls permanent in a letter dated January 7, 2021. (*Id.* ¶¶ 16-17.)

On January 14, 2021, Dr. Mundrati went to TRIA Orthopedics for acute symptoms including new radicular pain, numbness and weakness. CPN Nancy Schmidt noted that her lower extremity reflexes were 3+, she was "unable to do a one leg heel lift on the right" and had a positive straight leg raise on the right. She also noted "decreased EHL strength on the right. She now notes progressive leg numbness and intermittent weakness. She has extreme difficulty with heel raise on the right." (*Id.* ¶ 18.)

On January 22, 2021, Dr. Mundrati had a consultation with TRIA physical therapy to treat her back and leg pain and her balance problems. She attended five additional appointments. (PCSMF ¶ 20.)

On March 11, 2021, Dr. Mundrati consulted with Nina Watercott, OD, about her visual problems. She described her intense eye strain and fatigue with minimal reading or use of a computer screen which would result in a headache and significant eye pain. A visual eye exam still showed significant accommodative insufficiencies. (*Id.* ¶ 21.)

On March 19, 2021, Dr. Mundrati had an appointment with Dr. Groeschel and reported symptoms of urological issues, upper extremity weakness, more acute neck, mid back and lower back pain, which grew worse with standing, twitching and numbness in her lower extremities. Dr. Groeschel ordered MRIs of her spine because of concerns of neuropathy. (*Id.* ¶ 22.)

F.    Summit Terminates Dr. Mundrati's Employment

On January 15, 2021, Summit advised Dr. Mundrati that it was terminating her employment because she was not meeting the requirements of her position and it would not consider a permanent part-time schedule. Summit later completed an Employer Statement in which it confirmed that, until her last day worked (February 19, 2021), Dr. Mundrati was working five days per week, eight hours per day, receiving her normal salary. It also noted that she was receiving salary continuation through May 20, 2021. (DSUF ¶¶ 35-39; PCSMF ¶ 19.)

G.    Dr. Mundrati Files a Claim

Dr. Mundrati filed a claim for LTD benefits with Unum on March 26, 2021. (PCSMF ¶ 23.) Her claim form identified her allegedly disabling medical condition as TBI. She identified her "date last worked" as February 19, 2021 and the date she was "first unable to work due to this medical condition" as February 27, 2018, the date of the motor vehicle accident. (DSUF

¶¶ 13-14.)[5]

     H.  <u>Additional Treatment</u>

On March 29, 2021, Dr. Mundrati underwent MRI imaging of her cervical spine which revealed that she had serious issues involving her spinal cord. (PCSMF ¶ 24.)

She consulted with Kara Grangaard on April 20, 2021 to treat her ongoing urinary issues, including an increase in her frequency and urgency of urination, blood in her urine and incomplete emptying of her bladder. It was noted that Dr. Mundrati would need to use the bathroom every 1-2 hours during the day and had bladder pain and pressure that wakes her at night, and her bladder would regularly void involuntarily. (*Id.* ¶ 25.)

Dr. Mundrati consulted Dr. Leslie Hillman on April 22, 2021. Dr. Hillman observed that Dr. Mundrati had a positive Hoffman's (a test that may reveal myelopathy) bilaterally on exam and questionable Lhermitte's phenomenon (painful electrical sensation along the spine when the neck is moved). Dr. Hillman referred her to Dr. Matthew Kang, a neurosurgeon. (*Id.* ¶ 26.)

On May 12, 2021, Dr. Kang noted that Dr. Mundrati had "severe cervical stenosis" that corresponded to her many symptoms and he recommended immediate surgery. In preparation for cervical spine surgery, she had an appointment with her PCP, PA-C Jenna Sullivan, on June 22, 2021. The progress note stated:

> Dr. Mundrati has had significant neck pain, thoracic pain, and low back pain as well as upper and lower extremity paresthesia issues over the last few months…. The right paracentral disc herniation with cord deformation and compression on the right greater than the left at C5-6 corresponds to the multitude of her symptoms including extremity, body, urological, and potentially gastrointestinal symptoms. Per neurosurgery, there is a significant chance that her right-sided

---

[5] Unum notes that Dr. Hagen did not advise Dr. Mundrati to stop working; rather, he opined that she could "work with restrictions." The statement she submitted with her claim expressly stated that she would have been able to maintain employment "that will accommodate my restrictions and limitations."

imbalance is also due to her cervical myelopathy. She has some left-sided radiculopathy that corresponds to the foraminal stenosis at C5-6. This includes pain, paresthesias in the left upper extremity that are significant at times. Per neurosurgery, the radiographic findings of cord compression are concerning for further worsening and risk of paraparesis or paraplegia.

(*Id.* ¶ 31.)

On July 6, 2021, Dr. Kang performed open anterior arthroplasty (artificial disc replacement) at C4-5 and C5-6, as well as bilateral C4 through C6 foraminotomy (widening of the openings of the nerves). (*Id.* ¶ 32; DSUF ¶¶ 59-60.)[6]

I.    Unum's Investigation and Ultimate Denial of Claim in August 2021

During the adjudication of Dr. Mundrati's claim, Unum had two board-certified physicians review her medical records: family medicine physician, Tammy Lovette, M.D., and ophthalmologist Richard Eisenberg, M.D. (DSUF ¶ 40.) Dr. Lovette found no support for any restrictions or limitations. In reaching her conclusion, she noted the following:

- Plaintiff's symptoms (at that time, nearly three years post-accident) were not consistent with the mechanism of injury, as Plaintiff was ambulatory at the accident scene, indicated no loss of consciousness or amnesia, and made no neurological complaints at the emergency room.

- Plaintiff's brain MRI on May 23, 2018 was normal, and mild traumatic brain injury / concussion typically improves within a few days to weeks, with most patients achieving recovery within three months.

- Plaintiff was performing her clinical duties since July 2018 on a parttime basis with no deficiencies noted, and her May 2018 neuropsychological testing was normal. Furthermore, there were no clinical findings to suggest that Plaintiff was unable to perform her physical and cognitive tasks on a full-time / unrestricted basis.

- While Plaintiff was in treatment for headaches, they were not of a frequency or severity to preclude her occupational demands full-time. Plaintiff had also had infrequent adherence to abortive medications and had declined to try newer therapies that could have been highly effective

_____

[6] Unum notes that Dr. Mundrati's April 24, 2021 statement in support of her claim made no reference to any neck or back pain. (DSUF ¶ 61.)

in treating her headaches.

- If Plaintiff's ongoing fatigue was related to a traumatic brain injury, it is expected that it would have improved over time. Her fatigue was evaluated via sleep medical and no pathological condition was identified. However, Plaintiff was counseled to increase her sleep because her sleep time ranged from 4-8 hours on actigraphy. Doing so would likely improver her fatigue, as well as her overall well-being and physical and cognitive stamina.

(*Id.* ¶¶ 41-42.)

Dr. Eisenberg concluded that there were no restrictions and limitations based on Dr. Mundrati's visual functional capabilities, noting the following:

- Plaintiff's corrected visual acuity had consistently been 20/20 at both distance and near and color vision had been normal.

- Stereoacuity testing had yielded the maximal testing value, indicating excellent depth perception at near and adequate alignment of both eyes together.

- Neuro-ophthalmological examinations on May 31, 2019 and December 3, 2019 indicated normal convergence amplitudes, with no evidence of convergence insufficiency or any ophthalmic injury.

- Plaintiff's self-reported symptoms were not consistent with the expected natural history of post-concussion syndrome. Furthermore, self-reports of eye fatigue and photosensitivity with extended computer use were consistent with a finding of dry eyes, and were unrelated to any presumed traumatic brain injury.

Ultimately, both Dr. Lovette and Dr. Eisenberg concluded that, given Dr. Mundrati's normal neurological, ophthalmic, and neuropsychological examinations, no brain injury was identified that would necessitate cognitive restrictions nearly three years after the accident. (*Id.* ¶¶ 43-45.)

Given the disagreement of Dr. Lovette and Dr. Eisenberg with the restrictions imposed by Dr. Hagan, Unum then ordered a Designated Medical Officer Review by Vaughn Cohan, M.D., a board-certified physician in neurology. Dr. Cohan agreed with the conclusions of Dr.

Lovette and Dr. Eisenberg, explaining as follows:

> In summary, the claimant's neurologic physical and cognitive exam findings are reportedly normal. Neuropsychological testing revealed essential normal results. Formal sleep analysis revealed no evidence of a significant sleep disorder. The claimant's ongoing symptoms have been quite variable, at times nonproblematic, but she has continued to complain, nonetheless. Based on the mechanism of injury and passage of time, it is my opinion that the claimant's ongoing complaints have far exceeded the expected duration of typical post-concussive symptoms. The claimant's headaches pre-dated the motor vehicle accident in February 2018, and her response to prophylactic and rescue treatment has been inconsistent. It does appear that headache frequency and intensity are not consistent with an impairment that would require restrictions/limitations. Complaints of visual symptoms have been responsive to treatment, including prism lenses. Several neuro-ophthalmology consultations have not yielded objective findings to support restrictions/limitations.

> Although the claimant has been in psychotherapy, there is no evidence of a behavioral health impairment. Treating medical providers have not opined a behavioral health impairment. The claimant has demonstrated the ability to perform her occupational demands during her lengthy period of part-time work, and there is no objective evidence to support an inability to perform those same occupational demands on a full-time basis. Complaints of fatigue and low energy are not quantified and do not appear to preclude performance of normal non-work-related activities. Furthermore, those symptoms would be expected to have diminished and resolved within no more than two years from the date of accident.

(*Id.* ¶¶ 46-47.)

Following these reviews, Dr. Mundrati submitted additional information for consideration, consisting of: an April 1, 2021 report from Dr. Graf; a May 20, 2021 sleep medicine report from Eric Golden, M.D.; and optometry reports dated March 11, 2021, April 12, 2021, and June 11, 2021 from Dr. Watercott. Both Dr. Lovette and Dr. Cohan reviewed those additional materials and submitted addenda stating that their conclusions remained unchanged. Dr. Cohan noted that Dr. Graf's report indicated that a recent neurology consultation and brain MRI revealed no significant findings, Dr. Watercott's reports noted improvement with use of tinted prism lenses, and Dr. Golden's report focused on continued poor sleep hygiene. (*Id.* ¶¶ 48-50.)

Unum asserts that after a comprehensive review, it determined that Dr. Mundrati was not disabled as defined by the Policy and denied her claim on August 5, 2021. It concluded that the records and information that was submitted did not support restrictions or limitations within the elimination period of February 20, 2021 through May 20, 2021, a time period during which she acknowledged she could have continued to work part-time if Summit had continued to accommodate her restrictions. (*Id.* ¶¶ 51-52; PCSMF ¶ 34.) Dr. Mundrati disputes that Unum's review was comprehensive. (PRDCSF ¶ 51.)

J.    Dr. Mundrati's Appeal

Dr. Mundrati submitted an appeal to Unum on March 1, 2023.[7] (PCSMF ¶ 35; DSUF ¶ 53.) She provided additional documents in support of her claim.[8] (PCSMF ¶ 35; DSUF ¶ 54.) According to Unum, the updated medical records primarily reflected physical symptoms that she had allegedly experienced in 2021, including neck/back pain and numbness and discoloration in her toes. (DSUF ¶ 55.)

According to Unum, while Dr. Mundrati's March 19, 2021 neurological examination noted diminished sensation of the right foot and purplish toes, it was otherwise unremarkable with a normal gait noted and no evidence of weakness or incoordination. (DSUF ¶ 56.) Dr. Mundrati disputes this, noting that the March 19, 2021 neurological exam also referenced

---

[7] The appeal was filed over 18 months after the denial of her claim. Unum did not reject or deny the appeal as untimely, however, nor does it assert in its motion for summary judgment that the appeal was untimely.

[8] These documents include the letter dated January 7, 2021 identifying permanent R&Ls by Dr. Hagen; the progress note documenting the July 6, 2021 cervical spine surgery by Dr. Kang; a June 2022 urodynamic study confirming that she was experiencing detrusor overactivity (an involuntary contraction of the bladder); a 3-day Psychological and Vocational Evaluation ("PVE") with Justin King, PhysD, at the Metropolitan Rehabilitation in January 2023; a Functional Capacity Evaluation (FCE) with Michael Balandiat at UPMC on February 13, 2023; a second personal statement from Dr. Mundrati; and other updated medical records from January 2021 to February 2023.

headaches, upper extremity weakness, neck, mid-back and lower back pain, leg pain and twitches, and urinary urgency. (PRDCSF ¶ 56.) The March 29, 2021 MRI of her thoracic spine revealed mild multilevel spondylosis without spinal canal or neural foraminal stenosis. An MRI of her cervical spine on that same date revealed broad-based posterior disc osteophyte complex mildly flattening the cord and contributing to moderately severe spinal canal stenosis without cord signal abnormality at C4-5. (DSUF ¶¶ 57-58.)

Unum asserts that Dr. Mundrati's statement outlining the treatment for her physical symptoms included many which occurred after the elimination period on May 20, 2021. (DSUF ¶ 62.) In turn, Dr. Mundrati states that her physical symptoms did occur during the elimination period. (PRDCSF ¶ 62.) According to Unum, the February 9, 2023 PVE by Dr. King concluded that Dr. Mundrati had reduced speed of mental processing and physical tolerances that did not support a return to her occupation, which Dr. King classified as having "medium" physical demands. The February 13, 2023 FCE stated that she had "limited participation" that led to an inability to specify her physical demand level. That said, the FCE noted that she demonstrated limited tolerance for activity and exertion and that it "did not appear" that she could return to "medium physical demand duties as a Physiatrist at this point." (DSUF ¶¶ 62-65.) Dr. Mundrati notes that, with respect to the FCE, Unum's statement is misleading: she had "limited participation" only in that she was unable to complete the test because of fatigue, which was documented by the examiner. (PRDCSF ¶ 64.)

Unum had the additional materials provided by Dr. Mundrati reviewed by Scott Norris, M.D., a physician board-certified in family medicine, aerospace medicine, and occupational and environmental medicine.[9] Dr. Norris concluded that none of the new records supported

_____

[9] Dr. Norris has worked at Unum since 2010 and has not treated patients since that time. *Dwyer*

restrictions or limitations within the elimination period, specifically finding that "[a]lthough [Plaintiff] later underwent cervical spine surgery for based [sic] on her [symptoms] and imaging findings, the moderate degenerative findings on the cervical MRI would not categorically preclude [Plaintiff] from performing the demands of her Light Work occupation." He also highlighted that the February 9, 2023 PVE and the February 13, 2023 FCE "were not time-relevant regarding [Plaintiff's] functional capacity during the [elimination period] (2/20/21-5/20/21)." (DSUF ¶¶ 66-68.)

Dr. Norris also had peer-to-peer contact with Dr. Kang. In a letter to Dr. Kang, he asked him if he was "opining work restrictions/limitations for [Plaintiff] during the period of 2/20/21 through 5/20/21?" In response, Dr. Kang stated, "we have recommended work hardening/evaluations and defer." (DSUF ¶¶ 69-70.)

Based on Dr. Norris' review and communication with Dr. Kang, Unum advised Dr. Mundrati that it was planning to uphold its claim determination and invited Plaintiff to respond before a final decision was made. (*Id.* ¶ 71.) In response, Dr. Mundrati submitted a questionnaire from Dr. Kang in which he concluded that she could not have performed her occupation during the elimination period "due to physical demands of her job in setting of cervical spinal cord compression." Dr. Mundrati also submitted a supplemental statement focusing on all symptoms (both cognitive and physical) that she had allegedly experienced during the elimination period. (*Id.* ¶¶ 72-73.)

In this supplemental statement, Dr. Mundrati described the performance of her duties, which included injecting needles into patients' spines. (UA-CL-LTD-002684 ¶ 53.) She then stated that:

---

*v. Unum Life Ins. Co. of Am.*, 548 F. Supp. 3d 468, 483 (E.D. Pa. 2021).

> In order to safely perform these injections, the [ISP] needs to independently review the appropriate imaging ahead of time for each patient who was scheduled. We wear heavy lead aprons for multiple hours during the spine procedures to protect against radiation exposure from the X-ray machine. This means I would have my lead apron on while going through all of the frequent and repetitive movements, including: prolonged standing, bending, stooping, returning to normal posture, reaching then retracting the arms, walking, helping patients get up or down from the injection table, lifting, keeping the arms elevated during the entire procedure, etc. in between injections, we go to the next patient and provide consent, review the procedure, and answer any questions.

(*Id.* ¶ 54.)

Dr. Mundrati denies that Dr. Kang changed his opinion. (PRDCSF ¶ 72.)[10] In fact, when asked why he did not agree with Dr. Norris's assessment that Dr. Mundrati's exam findings were inconsistent with the severe level of impairment she reported or with a degree of functional compromise that would preclude "light work," Dr. Kang wrote:

> Clinical and imaging evidence for significant spinal cord compression and myelopathy with bladder dysfunction. MRI 3/29/2021 demonstrates findings. 12/31/20 X-ray C4-5 spondylolisthesis. Weakness in upper extremity noted as well. Many of these symptoms improved partially, but noticeably after surgery which further supports cervical source.

(UA-CL-LTD-002703.) When asked if, in his opinion, Dr. Mundrati could have safely performed her occupation during the elimination period, Dr. Kang responded: "No, due to physical demands of job in setting of cervical spinal cord compression." (UA-CL-LTD-002704.)

Unum claims that it concluded after full and fair consideration, it upheld its determination because the additional information submitted by Dr. Mundrati on appeal did not support restrictions or limitations throughout the elimination period. In its July 14, 2023 denial letter, Unum explained the rationale for its decision, in pertinent part, as follows:

---

[10] In her supplemental statement, Dr. Mundrati represented that Dr. Kang misunderstood the question and was discussing work hardening in January 2023, not during the elimination period. (UA-CL-LTD-002682, ¶ 46.)

During the evaluation of your client's claim, the duties and demands of her regular occupation were identified. According to the policy, your client's occupation is looked at according to how it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location. The occupational demands associated with the duties of a Physician included:

**Physical Demands:**

Light work […]

[…]

In order to be eligible for benefits, your client must satisfy the policy's definition of disability and be disabled through (and beyond) the elimination period. The Long Term Disability elimination period would have been from February 20, 2021 through May 20, 2021 and, as such, this is the time period relevant to her eligibility for benefits.

As your client's employment with the policyholder was terminated in February 2021, her coverage under the Long Term Disability policy would have also ended. Accordingly, any worsening or new conditions/symptoms or a decline in functional capacity outside of the relevant time period would not be covered under this claim.

[…]

The bilateral lower extremity electrodiagnostic study on February 21, 2021 was normal. There was no evidence of neuropathy, radiculopathy, or myelopathy.

Your client had an appointment with Dr. Ana Groeschel on March 19, 2021. The neurological examination noted diminished sensation of the right foot and purplish toes but was otherwise unremarkable with a normal gait noted and no evidence of weakness or incoordination.

The March 29, 2021 MRI showed multilevel degenerative disc disease primarily at C4/5 and C5/6 with moderate spinal stenosis, mild cord flattening, and mild bilateral neuroforaminal narrowing at C4/5, and mild/moderate spinal stenosis, and left neuroforaminal narrowing with encroachment of the left C5 nerve root at C5/6. The cord signal was normal.

[…]

On May 28, 2021, your client had an appointment with Dr. Matthew Kang. She reported right lower extremity motor dysfunction and urinary frequency/urgency since 2018. Dr. Kang noted a "subtle" left biceps weakness of 4+/5 and opined a

19

diagnosis of cervical radiculopathy and myelopathy. At the June 22, 2021 preoperative evaluation, light touch "disturbance" over the right foot was noted with otherwise normal neurological findings. Your client subsequently had C4/5 and C5/6 arthroplasty with bilateral C4-6 foraminotomy surgery for moderate cervical spine degenerative changes and associated symptoms on July 6, 2021.

In January 2023, Dr. Justin King performed a vocational/psychological evaluation . . . which included psychometric testing. The report concluded your client was not capable of returning to her occupation as an Interventional Spine Physician on a sustained basis. This evaluation occurred approximately two years after she ceased working. Although the results of this testing may be applicable [to] your client's functional capacity as of January 2023, her testing performance in January 2023 is not time relevant to her physical and cognitive function/capacity during the relevant time period of February 20, 2021 through May 20, 2021.

Your client also attended a functional capacity evaluation (FCE) on February 13, 2023. The report indicated that based on your client's limited participation, the evaluator was unable to specify her physical demand level. The FCE also occurred approximately two years after she ceased working and the results are not time relevant to her functional capacity during the relevant time period.

The reviewing physician also contacted Dr. Kang and inquired, in part, if he was opining work restrictions for the time period of February 20, 2021 through May 20, 2021. Dr. Kang responded and advised he refers to other treatment providers and work hardening/evaluation was recommended.

[…]

The medical records do not identify an organic condition that would preclude your client from performing her occupational or non-occupational activities **on a full-time basis** and do not support the presence of an underlying psychiatric condition of such severity as to preclude her from performing her occupational demands and non-occupational activities. The reviewing physician concluded the medical evidence does not support your client was incapable of performing her full time occupational demands throughout the elimination period of February 20, 2021 through May 20, 2021.

(DSUF ¶¶ 74-75; PCSMF ¶ 36) (emphasis added.)[11]

---

[11] As the language in bold above reflects, Unum did not rely on Dr. Mundrati's ability to perform part-time work to deny her appeal nor did it do so when denying her original claim. During oral argument on January 22, 2025, Unum acknowledged that it did not rely on a part-time issue in either denial. In fact, it may not do so: "A plan administrator may not fail to give a reason for a benefits denial during the administrative process and then raise that reason for the first time when the denial is challenged in federal court." *Harlick v. Blue Shield of Calif.*, 686 F.3d 699,

III.     **Standard of Review**

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if there are no genuine disputes as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).[12] Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Nat'l State Bank v. Federal Rsrv. Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler Cty. Fam. YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Ctr.*,

---

719 (9th Cir. 2012). *See* 29 C.F.R. § 2560.503-1(j)(1) (requiring the administrator to provide "the specific reason or reasons for the adverse determination.").

[12]   Both parties purport to quote the standard from Rule 56(c), but these provisions were transferred to subsection (a) in the 2010 amendments to the Rule.

*Pa.,* 242 F.3d 437, 446 (3d Cir. 2001).

The summary judgment rules do not apply any differently to cross-motions. *Lawrence v. City of Philadelphia, Pa.*, 527 F.3d 299, 310 (3d Cir. 2008). "'Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Id.* (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)). If upon review of cross-motions for summary judgment the court finds no genuine dispute over material facts, then judgment will be entered in favor of the party deserving judgment considering the law and undisputed facts. *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998) (citation omitted).

**IV.    Discussion**

A.    <u>Summary of the Parties' Respective Positions</u>

In her motion for summary judgment, Dr. Mundrati asserts that because Unum's decision to deny her LTD benefits was arbitrary and capricious, she is entitled to judgment in her favor. In support of her position, she relies upon Unum's continued classification of her regular occupation as physician, a light-duty position, despite evidence that her occupation was that of physiatrist, a medium-duty position; Unum's focus on its initial denial rather than the denial of her appeal; and Unum's refusal to consider the PVE and FCE as not "time relevant" even though no intervening event changed her condition since the end of the elimination period. She also discusses Unum's selective quoting from the record, its decision not to order an independent medical exam ("IME"), and its reliance on Dr. Norris, who did not examine her, instead of her

22

treating physicians.[13]

For its part, Unum argues that it is entitled to judgment in its favor because its decision that Dr. Mundrati was not disabled through the applicable elimination period was reasonable and was not arbitrary and capricious. It asserts that under the arbitrary and capricious standard, its determination should be upheld if it is possible to offer a reasoned explanation, and it had discretion to make a determination of Dr. Mundrati's claim. Unum also asserts the following: the scope of the Court's review is limited to the evidence before Unum when the determination was made; multiple physicians concluded that R&Ls were not supported during the elimination period; and information submitted on appeal did not support the claimed R&Ls and were otherwise not relevant to the applicable elimination period.

B. ERISA Standard of Review

Under ERISA, a civil action may be brought by a participant or beneficiary to recover or enforce his rights or benefits due to him under the terms of his plan. 29 U.S.C. § 1132(a)(1)(B). With respect to the standard for reviewing the decision of an ERISA plan administrator, the Supreme Court noted in *Conkright v. Frommert*, 559 U.S. 506 (2010) that:

> This Court addressed the standard for reviewing the decisions of ERISA plan administrators in *Firestone [Tire & Rubber Co. v. Bruch]*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 [(1989)]. . . we held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.*, at 115, 109 S.Ct. 948.
>
> We expanded *Firestone's* approach in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). . . We held that, when the terms of a plan grant discretionary authority to the plan administrator, a deferential standard of review remains appropriate even in the face of a conflict. *See id.*, at [116], 128 S.Ct., at 2350-51.

---

[13] Issues related to Dr. Norris will be discussed herein.

*Id.* at 512. *See also Est. of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009) (courts reviewing ERISA plan administrator's decision in civil actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B) should "apply a deferential abuse of discretion standard of review and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion.")

Thus, an administrator's decision "will be overturned only if it is 'clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan.'" *Orvosh v. Program of Grp. Ins. for Salaried Employees of Volkswagen of Am., Inc.*, 222 F.3d 123, 129 (3d Cir. 2000) (quoting *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 41 (3d Cir. 1993)). *See also Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011) ("An administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.")

As noted above, the Supreme Court has held that courts should continue to apply a deferential abuse-of-discretion standard of review when a conflict is present. Courts should consider this conflict not in formulating the standard of review, but in determining whether the administrator or fiduciary abused its discretion. *Glenn*, 554 U.S. at 115 (citations omitted). The Supreme Court held that it was not "necessary or desirable" for courts to create special procedural, evidentiary, or burden of proof rules to account for conflicts of interest, and that "conflicts are but one factor among many that a reviewing judge must take into account." *Id.* at 116.[14]

---

[14] Dr. Mundrati points to what she describes as procedural conflicts in Unum's decision-making process, such as relying on its consultants who have not examined her, selectively quoting from the record, limiting its review to records in the elimination period when it suits Unum's purpose and discarding this limitation when it does not, and failing to conduct an IME.

Dr. Mundrati argues that Unum improperly focuses on its initial denial of her claim even though, among other things, records she submitted on appeal regarding her spinal surgery relate back to a condition that went undiagnosed for three years and would fall within the elimination period. Unum asserts that Dr. Mundrati made no reference to back or neck pain in her original statement submitted to Unum, and her later statements in support of her appeal outlined treatment for symptoms that largely occurred after the elimination period. Unum also contends that Dr. Norris concluded  that none of the records submitted in connection with her appeal supported restrictions or limitations within the elimination period.

As the law requires, the Court will review all the evidence with a focus on Unum's decision on appeal. *See Funk v. CIGNA Grp. Ins.*, 648 F.3d 182, 191 n.11 (3d Cir. 2011) ("a plan administrator's final, post-appeal decision should be the focus of review," citing 29 C.F.R. § 2560.503-1(h)), *abrogated on other grounds by Montanile v. Bd. of Trustees of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136 (2016). *Funk* added that "[t]o focus elsewhere would be inconsistent with ERISA's exhaustion requirement." *Id.* (citing *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 258–259 (2008)) (noting that claimants must "exhaust the administrative remedies mandated by ERISA § 503, 29 U.S.C. § 1133, before filing suit under § 502(a)(1)(B)"); *Metro. Life Ins. Co. v. Price*, 501 F.3d 271, 280 (3d Cir. 2007) (same).

### C.  Dr. Mundrati's Regular Occupation

In part, Dr. Mundrati argues that Unum's decision was arbitrary and capricious because it misclassified her regular occupation as "physician," which is considered a light-duty position, instead of the correct designation of ISP or physiatrist, which is considered a medium-duty position. In turn, Unum supports its classification by asserting that it was based on Dr. Mundrati's own submissions as well as those of her employer. It also asserts that it considered

what she contended were her job requirements in making its decision, and that the differences between the two positions are not significant.

The Plan states that "[f]or physicians, 'regular occupation' means your specialty in the practice of medicine which you are routinely performing when your disability begins," and goes on to state that "Unum will look at your occupation as it is normally performed, instead of how the tasks are performed for a specific employer at a specific location."

Dr. Mundrati argues that Unum disregarded the distinction between light and medium duty occupations, asserting that she:

> provided Unum a thorough summary of the material and substantial duties of an [ISP], including constant careful manual dexterity to insert a needle into a patient's spine, constantly switch between near and far visuals, maintain constant communication with the procedure staff and the patient, and stand for the entire lengthy procedure, all while wearing a lead vest.

(ECF No. 24 at 15.) According to Dr. Mundrati, these represent are "material duties that 'cannot be reasonably omitted' from the occupational requirements of an [ISP]." Nor does she claim, nor has Unum shown, that her duties were inconsistent with the duties of other national ISPs or physiatrists. Thus, she argues, these material duties should have been considered by Unum, and its failure to do so was arbitrary.

Unum relies in part on a Vocational Review by its vocational rehabilitation consultant, Gregory Applekamp. (UA-CL-LTD-001336.) Unum contends that Dr. Mundrati's statement in connection with her application for LTD benefits focused only on the effect of the TBI on her ability to work, with no reference to any strength component or restriction. Unum argues that Applekamp's description of Dr. Mundrati's job demands are consistent with those of a physiatrist: "Both involve evaluating patients through examinations and diagnostic studies, and analyzing those findings to diagnose conditions and prescribe treatments." (ECF No. 46 at 4.)

26

Although Dr. Mundrati's first statement focused on the mental requirements of her position and how they were affected by her TBI, her second and supplemental statements focused on the physical requirements of the position and how they were affected by her spinal issues. Unum contends that this change "is nothing more than an attempt to retroactively obfuscate her claim history and rewrite her claim, which until two years after the elimination period was exclusively centered around her TBI and alleged cognitive deficits." (ECF No. 42 at 19.) Dr. Mundrati claims, however, that the record reflects that she had a major downturn in 2019 and further complications in 2021 from severe spinal issues that were undiagnosed for three years. Therefore, the fact that her appeal included medical records relating to spinal issues from 2021 and statements that focused on physical limitations from these spinal issues is not dispositive. And while Unum appears to suggest that Dr. Mundrati could not provide evidence of additional disabling conditions, her claim "does not depend on her exact primary diagnosis." *Chicco v. First Unum Life Ins. Co.*, 2022 WL 621985, at *5 (S.D.N.Y. Mar. 3, 2022).

In *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 386 (3d Cir. 2003), the Court of Appeals held that "regular occupation" "is the usual work that the insured is actually performing immediately before the onset of disability." The court held that "Even were a court not to limit itself exclusively to the claimant's extant duties, that person's 'regular occupation' nonetheless requires some consideration of the nature of the institution [at which the claimant] was employed." *Id.* (citation omitted). Thus, the court concluded, the insurer's interpretation of the phrase "regular occupation" to include "as it is performed in a typical work setting for any employer in the national economy" was not reasonable.

It is true that the plan in *Lasser* left the term "regular occupation" undefined. But in this case, the Plan stated that Unum would "look at your occupation as it is normally performed in

the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." *See Glunt v. Life Ins. Co. of N. Am.*, 2012 WL 205882, at *6 (E.D. Pa. Jan. 24, 2012) (distinguishing *Lasser* when the plan defined "regular occupation"); *Nyman v. Liberty Mut. Assur. Co. of Boston*, 2005 WL 2175706, at *12 (M.D. Pa. Sept. 7, 2005) (same). *See also Hawks v. PNC Fin. Servs. Grp. Inc.*, 2024 WL 3664599, at *4 (3d Cir. Aug. 6, 2024) ("the plan definition in [*Lasser*] made no reference to how the occupation was performed in the national economy so it is of little help.")

In *Weiss v. Prudential Insurance Co. of Am.*, 497 F. Supp. 2d 606 (D.N.J. 2007), the benefits plan stated that Prudential "will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location." *Id.* at 608. While the court found that this definition would permit the insurance company to look outside the specific employer to determine whether the plaintiff could perform his regular occupation, this did not answer whether Prudential acted arbitrarily and capriciously in looking at the broad category of plaintiff's occupation rather than a more specific descriptive category. *Id.* at 612-13. The court concluded that Prudential never analyzed the significance of the physical demands and requirements for the plaintiff to perform his duties and that its interpretation of the policy was unreasonable based on the goals of LTD benefits and a consideration of the plain language of the policy. *Id.* at 614-15. *See also McCann v. Unum Provident*, 907 F.3d 130, 148 (3d Cir. 2018) (Unum erred by designating Dr. McCann as a diagnostic radiologist instead of an interventional radiologist, the "recognized specialty" in which he was engaged); *Hardy v. Unum Life Ins. Co. of Am.*, 2024 WL 4043540, at *13 (D. Minn. Sept. 4, 2024) (Unum classified Hardy as an "attorney" but "failed to adequately consider Hardy's functionality through the lens of his occupation as a medical malpractice trial attorney.")

Thus, although Unum was not required to look at Dr. Mundrati's occupation as specifically performed at Summit, and certainly not exclusively so, it was required to consider her specialty in the practice of medicine. Unum has not explained why it chose to categorize Dr. Mundrati as a "physician," a light-duty occupation, rather than as an ISP or physiatrist which, according to the DOT, is considered a medium-duty occupation "as performed in the national economy." Its briefs do not discuss *Lasser*, *Weiss* or any other case on the issue of "regular occupation." Indeed, Unum does not dispute Dr. Mundrati's supplemental statement about her job duties, nor does it contend that they are inconsistent with how the position is performed in the national economy.

Dr. Mundrati notes that a critical difference between light duty jobs and medium duty jobs is that, although light duty jobs can be performed while sitting for most of the day, in a medium duty job "being on one's feet for most of the day is critical." SSR 83-10 (ECF No. 45 Ex. 1 at 9.) While Dr. Mundrati's supplemental statement clearly articulated the details of her work procedures, Dr. Norris's review of her appeal simply referred to her occupation as "light duty" with no explanation for why he classified that way. The same is true of Unum's decision denying the appeal. Notably, the PVE and FCE referred to the demands of Dr. Mundrati's position as medium duty. And although Dr. Norris discounted these tests as "not time-relevant," as discussed below, he did not suggest that their assessment of Dr. Mundrati's job duties or position was incorrect or that it had changed after the elimination period.

During oral argument, Unum contended that the distinction between light duty work and medium duty work was "just a label." This contention conflicts with the terms of the Plan, which requires Unum to look at Dr. Mundati's medical specialty as it is normally performed. Nor did Unum challenge her representations about her physical job duties or her assertion that these

duties were limited by her condition.

Thus, the Court concludes that Unum's decision to classify Dr. Mundrati's occupation as light duty, contrary to the evidence it received and the requirements of the Policy, supports her contention that its decision was arbitrary and capricious.

### D. Rejection of Evidence Based on "Time Relevance"

As further evidence of the arbitrary and capricious nature of Unum's position, Dr. Mundrati argues that Dr. Norris refused to consider several crucial pieces of evidence, namely, the VPE and the FCE. Unum responds that it did consider this evidence but found that it was not time relevant to demonstrate that Dr. Mundrati met the disability requirement during the elimination period. Dr. Norris rejected the FCE based on Dr. Mundrati's "limited participation" and because he deemed it not "time relevant" to disability during the elimination period.

Courts have held that generally, FCE "is an objective measure of a person's physical limitations." *Moros v. Connecticut Gen. Life Ins. Co.*, 2014 WL 323249, at *10 (E.D. Pa. Jan. 29, 2014). *See also Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 770 (7th Cir. 2010); *Brookbank v. Anthem Life Ins. Co.*, 2016 WL 1611380, at *13 (S.D. Ohio Apr. 20, 2016), *report and recommendation adopted*, 2016 WL 2853578 (S.D. Ohio May 16, 2016).

Unum contends that Dr. Norris did consider the PVE—which he noted "may be applicable to [Dr. Mundrati's] functional capacity as of Jan 2023"—and the FCE—which he concluded was "unable to specify [her] physical demand level" due to "limited participation."[15] Contrary to the implication by Dr. Norris that Dr. Mundrati's "limited participation" represented some intentional effort on her part to avoid examination, however, a review of the entire FCE

---

[15] The FCE also stated that it did not appear that Dr. Mundrati could return to "medium physical demand duties as a Physiatrist at this point." The PVE by Dr. King similarly concluded that Dr. Mundrati's condition did not support a return to her position because her job duties had medium physical demands.

reflects that the examiner stated that Dr. Mundrati "became observably fatigued, los[t] train of thought, somewhat steady at times" and that she requested to lie down to rest before leaving. (UA-CL-LTD-002509, 2515-16.) Dr. Norris does not reference this portion of the FCE.

Simply put, the FCE examiner who observed Dr. Mundrati in person concluded that she could not complete the exam because of her observable fatigue. Unum has not explained how Dr. Norris, who never examined Dr. Mundrati, could draw a negative inference based solely on a record review that her inability to finish the exam resulted from "limited participation." Thus, despite reviewing these records, neither Dr. Norris nor Unum provided any reasoned basis for rejecting their conclusions.[16]

As for the issue of time relevance, Dr. Mundrati argues that Unum cites no support for its contention that this is a valid basis for rejecting medical records and, in any event, given that there were no intervening events between the elimination period and these tests, Unum cannot justify its decision to exclude them.

Dr. Mundrati notes that several courts have raised issues with insurers for these kind of "time relevance" refusals to consider evidence. *See Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 776 (7th Cir. 2010) ("MetLife asked Holmstrom to undergo more testing, and rejected the results at least in part because the testing was not done before it made the request. That behavior also reflects arbitrary and capricious decision-making."); *Haag v. Unum Life Ins. Co. of Am.*, 2023 WL 6960369, at *13 (N.D. Cal. Oct. 20, 2023) (FCE conducted outside review period was entitled to "some weight, as it corroborates Haag's self-reporting at the time of the case closure

---

[16] Dr. Norris's record-only reviews for Unum have been criticized in cases in this Circuit and elsewhere. *See, e.g., Dwyer,* 548 F. Supp. 3d at 483; *Wessburg v. Unum Life Ins. Co. of Am.*, 2024 WL 3444044, at *9 (D. Minn. July 15, 2024); *Braun v. Unum Life Ins. Co. of Am.*, 2022 WL 17740459, at *2 (N. D. Ill. Dec. 16, 2022); *Boykin v. Unum Life Ins. Co. of Am.,* 2022 WL 458213, at * 16 (E.D. Cal. Feb. 15, 2022); *Boersma v. Unum Life Ins. Co. of Am.*, 546 F. Supp. 3d 703, 713 (M.D. Tenn. 2021).

as well as Dr. Manvelyan's notations in the LTD claim form."); *Chicco*, 2022 WL 621985, at *4 (questioning Dr. Norris's discounting of exams performed after Chicco stopped working as not time relevant when "Chicco's condition is progressive, and her exam findings are consistent with a worsening condition causing increasing pain—precisely what Chicco argues stopped her from being able to work."); *Boersma*, 546 F. Supp. 3d at 712 n.5 (FCE performed outside the period of review "may still be relevant, at least in the absence of some reason to conclude that there was an intervening change in the beneficiary's health."); *Dimopoulou v. First Unum Life Ins. Co.*, 162 F. Supp. 3d 250, 261 (S.D.N.Y. 2016) (when Unum refused to consider exams based on time relevance, the court determined that, "while not dispositive as to plaintiff's mental health diagnosis at the time of her claim, [they] directly contradicted Unum's conclusion that plaintiff's symptoms were a result of depression. It was arbitrary and capricious to exclude it from consideration, because contrary to the reviewing physician's conclusion, it is indeed relevant as to whether plaintiff suffered from CFS or fibromyalgia on the date of her claim.").

In *Kaviani v. Reliance Standard Life Ins. Co.*, 373 F. Supp. 3d 1337 (M.D. Fla. 2019), *aff'd*, 799 F. App'x 753 (11th Cir. 2020), a case on which Dr. Mundrati relies, the insurer argued that an IME and FCE should not be considered by the court because they were not taken during the elimination period. The court rejected this argument:

> Defendant's argument ignores reality. First, Defendant considered this evidence on appeal. Second, the evidence corroborates evidence from the relevant timeframe that Defendant had deemed too subjective. Plaintiff was not suddenly complaining of a completely new ailment on appeal. When Plaintiff initially submitted his claim, he included evidence that he was suffering from the exact pain that was later substantiated by Dr. Ross and the FCE. It is unreasonable to conclude that this later evidence is somehow irrelevant to the question of whether Plaintiff was, in fact, experiencing such pain.

*Id.* at 1345 (footnote omitted).

Unum contends that *Kaviani* is distinguishable because the reviewing physician "did not consider" the FCE on the ground that it had "been deemed invalid," while Dr. Norris did consider the PVE—which he noted "may be applicable to [Dr. Mundrati's] functional capacity as of Jan 2023"—and the FCE—which he concluded was "unable to specify [her] physical demand level" due to "limited participation." Unum also argues that the court in *Kaviani* merely rejected the insurer's argument that the FCE should not be considered at all because it had not been conducted during the elimination period, while here Unum is not making that argument.

However, Dr. Norris provided no basis for concluding that the PVE did not relate back to Dr. Mundrati's functional capacity during the elimination period. Unum also points to no evidence that Dr. Mundrati's condition was changed by some intervening event after the elimination period. Therefore, it provides no reasoned basis for completely excluding the results of the PVE and FCE that post-dated the elimination period.

Unum contends that a more relevant case is *Ovist v. Unum Life Insurance Co. of Am.*, 14 F.4th 106 (1st Cir. 2021). That case involved "a dispute over the applicability of a self-reported symptoms benefit limitation provision to a long-term disability claim." *Id.* at 108. This "SRS" provision allowed Unum to extend only 24 months of LTD benefits for disabilities because of mental illness and disabilities based on self-reported symptoms. Based on Dr. Norris's review, Unum terminated Ovist's LTD benefits relying on the SRS limitation.

Ovist provided Unum with the results of a Cardiopulmonary Exercise Test (CPET) that was conducted by exercise physiologist Jeffrey Cournoyer after the elimination period. The court stated that:

> Unum's medical consultant, Dr. Norris, reviewed the CPET results and concluded that the test was not time-relevant and did not reflect Ovist's maximal effort. Dr. Norris's assessment of Ovist's maximal effort was, at least in part, supported by Cournoyer's own statement that Ovist "demonstrated maximal effort in some, but

not all of the testing measures." On the other side of the ledger, Cournoyer opined that the tests on both days were "of maximal nature." His report lists respiratory, metabolic, and other markers showing that Ovist experienced fatigue and cognitive impairment following physical activity on both days. And Ovist argues that the seven-month gap between the February 2015 termination of her claim and the administration of the CPET is not meaningful because there is no evidence that her symptoms changed during that period.

*Id.* at 121. Unum credited Dr. Norris's opinion over Couroyer's findings. The court found:

no basis on the record to conclude that Dr. Norris's opinion is unreliable. Thus, Dr. Norris's critique of the CPET provides a reasonable basis for Unum to find that the CPET results alone did not compensate for the considerable absence in the record of objective evidence of Ovist's functional loss, and therefore to conclude that Ovist's "functional limitation was based primarily on self-reported pain and fatigue."

*Id.* at 122.[17]

That said, the court's ultimate conclusion was that "notwithstanding Ovist's CPET results, Unum's decision to apply the SRS limitation to Ovist's claim was reasonable and rests on substantial evidence in the record as a whole." *Id.* Thus, as Dr. Mundrati notes, this case differs from *Ovist* because: (1) the Summit Plan does not have an SRS limitation; (2) the record contains physical examinations between the start of the elimination period and the testing in which her physicians found that she had notable functional limitations, including neck pain documented in TRIA Orthopedic records beginning in January 2021, by Dr. Kang both pre- and post-operatively in 2021 and by PA-C Ilg in 2022; and (3) the etiology of her condition can be traced to both her TBI and her severe spinal injuries.

---

[17] Unum cites *Frost v. Unum Life Insurance Co. of Am.,* 2023 WL 2261415 (E.D. Tenn. Feb. 14, 2023), for the proposition that time relevance is a legitimate consideration where a reasoned basis for discounting an FCE's conclusion is provided. In fact, the court said that "Unum's benefits determination in *Ovist* was not based solely on the 'time-relevance' of the functional evaluation, nor was the First Circuit's analysis. The same is true here." *Id.* at *10 (footnote omitted).

Thus, the *Ovist* case is not particularly useful in resolving this issue. In addition to the points made by Dr. Mundrati, the court in *Ovist* did not simply approve of Dr. Norris's rejection of the CPET as "not time-relevant."

At oral argument, Dr. Mundrati pointed out that the record established that her condition mostly stayed the same between 2021 and 2023, with perhaps slight improvement. See UA-CL-LTD-002005 (progress note from Dr. Kang indicating that, as of September 13, 2021, her condition was improving after the surgery). As a result, there would be no basis for rejecting records from a later date. In other words, she was not attempting to use later records from a time period when her condition worsened to relate back to the elimination period to bolster her claim. Unum did not address this point.

Thus, Unum's rejection of evidence as not time-relevant was arbitrary and capricious.

E.   Other Issues

In addition to these points, Dr. Mundrati also raises Unum's selective quoting from the record, its failure to order an IME, and its reliance on a document review by Dr. Norris instead of the opinions of her treating physicians. While not dispositive, these matters remain relevant to Unum's decision-making process and to the outcome of this case.

Dr. Mundrati argues that Unum selectively reviewed only those medical records that supported a denial of benefits, considered records outside the elimination period only when they supported a denial and found significant later records not "time relevant."

Despite Unum's claim that it reviewed the entire record, its reviewers cited only those portions of the medical record that supported its denial of the claim. More importantly, Unum's reviewing physicians did not explain why they were rejecting other portions of the record. Dr. Mundrati points in particular to Unum's failure to address her visual fatigue and its unexplained

conclusion that her headaches were "stable," which she argued was not only belied by the record (her physicians tried many medications without success) but also irrelevant.

Dr. Mundrati also notes that Unum failed to arrange for an IME even though the Policy allowed for it. Unum responds that it was not required to order an IME and that the failure to do so does not show that its review was arbitrary and capricious. Unum is correct. However, courts have held that "a decision to forego an IME and conduct only a paper review, while not rendering a denial of benefits arbitrary *per se*, is another factor to consider in the Court's overall assessment of the reasonableness of the administrator's decision-making process." *Schwarzwaelder v. Merrill Lynch & Co.*, 606 F. Supp. 2d 546, 559 (W.D. Pa. 2009). *See also Reed v. Citigroup, Inc.,* 658 F. App'x 112, 115 (3d Cir. 2016) (a plan administrator's "failure to order an IME, which it was allowed to do under the Plan, is a factor we can consider in determining whether its decision to terminate benefits was arbitrary or capricious.").

On a related note, Dr. Mundrati argues that foregoing an IME and denying a claim based on a record review is all the more concerning when a claimant like her has subjective symptoms such as pain, migraines and fatigue which objective evidence cannot substantiate. *See Fisher v. Aetna Life Ins. Co.*, 890 F. Supp. 2d 473, 483 (D. Del. 2012) ("requiring objective evidence where none may be available, such as the case with fibromyalgia, chronic fatigue syndrome, migraines and muscle tension headaches, is arbitrary and capricious."); *Heim v. Life Ins. Co. of N. Am.*, 2012 WL 947137, at *8 (E.D. Pa. Mar. 21, 2012) (recognizing "the problem inherent in requiring objective evidence of the symptoms or bases of diagnoses for which there are no objective tests, such as chronic fatigue."); *Whitehouse v. Unum Life Ins. Co. of Am.*, 722 F. Supp. 3d 918, 926 (D. Minn. 2024) ("Whitehouse's chronic fatigue syndrome diagnosis, plus her reports of ongoing pain and fatigue and their impact on her ability to work, are not upended by

the lack of objective tests. Dr. Norris does not explain why Whitehouse's normal test results are inconsistent with the types of symptoms and limitations associated with chronic fatigue syndrome and central sensitization."); *Carney v. Unum Life Ins. Co. of Am.*, 596 F. Supp. 3d 845, 856 (E.D. Mich. 2022) ("the Court does not accept the contrary conclusions of Dr. Norris and the other Unum file reviewers as persuasive. First, the medical opinions upon which Unum relied were all based solely on reviews of Carney's file, rather than on in-person medical examinations, despite the fact that Carney's complaints (pain and its ensuing effects) are highly subjective in nature and amenable to more effective evaluation and understanding when personal communication and observation is possible.").

According to Dr. Norris, although Dr. Mundrati reported generalized fatigue, "Sleep study was negative, and extensive Endocrine, Rheumatology, and general medical evaluation did not identify a converging underlying organic diagnosis to explain [her] reported fatigue." (UA-CL-LTD-002598.) As in the cases cited above, Dr. Norris appears to have required Dr. Mundrati to produce an objective test result to explain a subjective symptom. This undermines the decision not to examine her in person or arrange for an IME, as there was no basis for disbelieving her reported symptom.

At oral argument, Unum explained that while it did not order an IME, it relied on records from Dr. Hagen, who was essentially Dr. Mundrati's treating physician, and Dr. Norris spoke to Dr. Kang. Of course, these efforts, while not insignificant, were not the equivalent of obtaining an IME and notably, Dr. Hagen lacked access to Dr. Mundrati's later medical records about her severe spinal issues. As for Dr. Kang, Dr. Norris did not acknowledge his last communication and concluded without explanation that Dr. Kang had changed his opinion.

Although Unum was not required to order an IME, its decision not to take this step, and to rely on a record review by Dr. Norris, further supports Dr. Mundrati's contention that Unum's denial of her appeal was arbitrary and capricious. In addition, Dr. Norris's failure to include his last communication with Dr. Kang and Unum's unexplained omission of this information in its denial undermine Unum's position that it considered all the information available to it.

Dr. Mundrati also argues that Unum failed to accord sufficient deference to the opinions of her treating physicians. As the Supreme Court has held, "plan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The Court added that:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Id.* at 834 (footnote omitted). *See also Stratton v. E.I. DuPont de Nemours & Co.*, 363 F.3d 250, 255-58 (3d Cir. 2004) (it was not arbitrary and capricious for administrator to have its own physicians review plaintiff's medical information and to ultimately disagree with plaintiff's treating physician's finding of disability). *But see Miller*, 632 F.3d at 854 (exclusive reliance on the incomplete conclusions of outside evaluators, who failed to substantively analyze plaintiff's diagnosis, demonstrated that plan administrator could not have fully considered all of plaintiff's diagnoses); *Levine v. Life Ins. Co. of N. Am.*, 182 F. Supp. 3d 250, 263 (E.D. Pa. 2016) ("Courts have expressed concern where an administrator denies a claim in reliance on reports from paper-review consultants that contradict the treating and examining physicians' consistent and concurring opinions that the claimant is disabled.")

Unum was not required to accept the opinions of Dr. Mundrati's treating physicians. However, its decision to rely on Dr. Norris's unreasonable and selective paper review over her treating physicians is another factor to take into account in determining whether its review was arbitrary and capricious.

## V.  Conclusion

To be sure, an ERISA plan administrator like Unum is entitled to a deferential standard of review, and its decision to deny benefits will be overturned only if it is unsupported by the record evidence, without reason or erroneous as a matter of law. Here, despite employing this standard, the Court concludes that Unum's decision to deny benefits to Dr. Mundrati was arbitrary and capricious. As explained more fully above, the Court's findings are based on Unum's unexplained and significant mischaracterization of Dr. Mundrati's position as a physician with light duty activities instead of a physiatrist with medium duties, its focus on its initial denial rather than on the appeal and its unexplained, unreasonable and convenient rejection of crucial pieces of evidence as "not time relevant" even though they relate back to her original injury without any evidence of an intervening event. This decision is bolstered by Unum's reliance solely upon a document review only by Dr. Norris, who unreasonably ignored critical evidence, including the opinions of her treating physicians.

Therefore, Dr. Mundrati's motion for summary judgment will be granted and Unum's motion for summary judgment will be denied.

Appropriate orders follow.

Dated: March 24, 2025                    BY THE COURT:

                                         /s/Patricia L. Dodge
                                         PATRICIA L. DODGE
                                         UNITED STATES MAGISTRATE JUDGE